# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### December 11, 2013 Session

## DANNY RAY SMITH v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2005-C-2438      Steve R. Dozier, Judge**

---

**No. M2013-00443-CCA-R3-PC- Filed April 15, 2014**

---

The petitioner, Danny Ray Smith, appeals the denial of his petition for post-conviction relief, arguing that he received ineffective assistance of counsel at trial. After review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JERRY L. SMITH, J., joined. CAMILLE R. MCMULLEN, J., concurred in results only.

James O. Martin, III, Nashville, Tennessee, for the appellant, Danny Ray Smith.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Sharon Reddick, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

The petitioner was convicted of three counts of rape of a child, a Class A felony, and four counts of aggravated sexual battery, a Class B felony, and sentenced to an effective term of twenty-three years at 100% in the Department of Correction. The judgments were affirmed by this court on direct appeal, and the Tennessee Supreme Court denied his application for permission to appeal. State v. Danny Ray Smith, No. M2009-02275-CCA-R3-CD, 2011 WL 1432033, at *1 (Tenn. Crim. App. Apr. 13, 2011), perm. app. denied (Tenn. Aug. 25, 2011).

The testimony from trial was recited by this court on direct appeal as follows:

At trial, the victim, L.H., testified that she was born in 1992, and that she was less than 13 years old when the [petitioner] had sexual contact with her. During the time period listed in the indictment, L.H. lived with her mother, her two brothers, and the [petitioner]. The [petitioner] began living with L.H. and her family in 1997, and in 2001, the [petitioner] married L.H.'s mother. L.H.'s mother testified that she first met the [petitioner] while he was coaching her son's football team. L.H.'s mother testified that all of her children loved the [petitioner] like a father and that there were no conflicts between the [petitioner] and L.H. L.H. testified that during the time period listed in the indictment, her family lived in four different residences: a duplex located on Belgium Court, a residence located on Baton Rouge,[1] another residence located on Andrew Jackson, and a home on Netherlands Drive.[2]

L.H. testified that the first sexual encounter with the [petitioner] she could remember occurred at the Belgium Court duplex when she was six or seven years old. L.H. testified that the [petitioner] came into the room and "put his hand down [her] pants and rubbed on [her] vagina" until she woke up. L.H. and her mother testified that L.H. shared a bedroom with her brothers at that duplex and that L.H. slept on the top bunk, while her brothers slept on the bottom bunk. L.H. testified that she could remember two or three other instances where the [petitioner] engaged in sexual contact with her at that duplex. L.H. told the jury that one morning she was eating cereal when the [petitioner] came into the kitchen wearing only a towel. L.H.'s brothers were upstairs getting ready for school, and L.H.'s mother had already left for work. The [petitioner] grabbed L.H.'s hair, pulled her hair back, and then "stuck his penis in [her] mouth." The [petitioner] quickly removed his penis "put his towel back on and went upstairs like nothing ever happened." Similarly, L.H.'s mother testified that the [petitioner] would often pull her hair during sex.

L.H. testified that while her family was moving to the residence at Baton Rouge, the [petitioner] went back to the duplex "to get more stuff" and insisted that she go with him. Once at the duplex, the [petitioner] forced L.H. to perform fellatio on him. When she finished, he picked a "sucker" up from

---

[1] L.H.'s uncle lived with the family at the Baton Rouge residence in a downstairs "den."

[2] L.H.'s mother provided corresponding dates for when the family lived in each residence: Belgium Court from May 1998 to May 1999, Baton Rouge from May 1999 to May 2000, Andrew Jackson from May 2000 to February 2002, and Netherlands Drive from February 2002 to the time of trial.

the floor and "tried to give" it to her "as an award." L.H. also testified that while living at the Baton Rouge residence, the [petitioner] took her downstairs to her uncle's room, showed her a pornographic magazine, and forced her to masturbate him while they looked at the magazine. L.H.'s mother testified that her brother kept a basket full of pornographic magazines when he lived with them at the Baton Rouge residence and that the children were not allowed in his room. On another occasion, at the Baton Rouge home, L.H. was home sick from school when the [petitioner] forced her to perform fellatio on him.

L.H. testified that after the family moved to the Andrew Jackson home, the [petitioner] began to show her pornographic videos. On one occasion, the [petitioner] sat in a pink chair in L.H.'s room and forced her to sit in his lap and masturbate him while they watched a pornographic video. L.H.'s mother testified that at the Andrew Jackson residence, L.H. had a table with two pink chairs and a combination television and VCR. L.H.'s mother also testified that she knew the [petitioner] kept pornographic videotapes with the family's home movies. On another occasion at the Andrew Jackson home, L.H. was asleep in her room with her little brother sleeping on a trundle bed next to her. The [petitioner] entered the room and removed L.H.'s clothes. The [petitioner] then rubbed his penis on the outside of L.H.'s vagina until he ejaculated on her bed and left the room. L.H. also testified that one day at the Andrew Jackson house, her brothers had a friend over when the [petitioner] made them lunch. After making lunch, the [petitioner] took her into a bathroom, where he made her masturbate him until he ejaculated. The [petitioner] then sent L.H. to the kitchen to have lunch with the other children.

L.H. testified that once the family moved to the Netherlands Drive house, the [petitioner] began to show her pornography on the computer. L.H.'s mother testified that she knew the [petitioner] kept pornography on the computer. L.H. told the jury that she "usually" had to masturbate the [petitioner] until he ejaculated when they viewed pornography on the computer. L.H. testified that this happened "a lot" and that sometimes the [petitioner] would rub the outside of her vagina with his hand while they viewed the pornography. L.H. testified about several other incidents that occurred while her family was living at the Netherlands Drive house. L.H. testified that on one occasion, the [petitioner] rubbed his penis on the outside of her vagina and sniffed a substance in a bottle labeled "Rush." L.H. also testified that the [petitioner] had a secret compartment in his dresser where he kept a pair of handcuffs and that on one occasion, he handcuffed her to her bed and rubbed his penis on the outside of her vagina until he ejaculated. L.H.'s

-3-

mother testified that there was a hidden compartment in the dresser and that she found a yellow sock among the [petitioner]'s clothing. L.H. also recalled that on one occasion the [petitioner] asked her, "Who's your daddy" while he rubbed his penis on her. L.H.'s mother testified that the [petitioner] would ask her "Who's your daddy" while they had sex and that there was no reason for L.H. to have known that phrase.

L.H. told the jury that while she was living at Netherlands Drive her mother went on an overnight business trip. The [petitioner] took L.H. into her mother's bedroom where he forced her to perform fellatio on him and then he rubbed his penis on the outside of her vagina until he ejaculated. L.H. testified that this incident "took a lot longer than most of the times." On another occasion, when L.H. was home after school, the [petitioner] performed cunnilingus on her. L.H. testified that while the [petitioner] performed cunnilingus on her, her mother called the [petitioner] on his cell phone. The [petitioner] answered the phone and was out of breath. The [petitioner] told her mother that he was "not trying to get off of the phone." L.H.'s mother testified that during her relationship with the [petitioner], she only went on one out of town business trip. L.H.'s mother recalled that while she was on that trip, she called the [petitioner], the [petitioner] answered the phone and seemed like he was out of breath. The [petitioner] tried to hurry her off the phone. L.H.'s mother testified that this occurred in July 2004.

L.H. testified that the last incident occurred around Christmas 2004. L.H., her mother, and her step-sister had gone to Wal-Mart when L.H. began to feel ill. Her mother brought her back home, where she was left alone with the [petitioner]. L.H. testified that the [petitioner] entered her room, took her clothes off, and rubbed his penis on the outside of her vagina. L.H. screamed for help, and the [petitioner] said, "Nobody is going to help you . . . [n]obody can hear you[,] [j]ust shut up." L.H. cried while the [petitioner] continued to rub his penis on her. L.H.'s mother testified that when she returned home from Wal-Mart, L.H. had been crying and that when she asked L.H. what was wrong, L.H. became so upset she began throwing up.

In January 2005, L.H. was playing on a trampoline in her front yard with two friends. Her friends were complaining "about how their [lives] [were] terrible" when L.H. became upset and started crying. L.H. then told them about what the [petitioner] had done to her over the past several years. L.H. made her friends promise not to tell anyone about the [petitioner]'s sexual

abuse. L.H.'s friend and neighbor, N.W.,[3] returned to her home and told her mother. N.W.'s mother then called the police. L.H. testified that she never wanted to call the police or tell her mother because she was scared of the [petitioner].

One of the first police officers to speak with L.H. was Officer Craig Christie of the Metropolitan Police Department (MPD). L.H. at first denied that the [petitioner] had done anything to her because she was scared, but she eventually admitted to Officer Christie that the [petitioner] had sexually abused her. Officer Christie testified that he was not trained to interview the victim; therefore, he only asked general questions to determine if a detective should be called. L.H.'s mother was not at the home when the police first arrived. After she arrived and was told why the police were there, L.H.'s mother began to cry and "got really mad, very angry." L.H. tried "to calm her mother down," telling her that it was okay and that everything would be fine. Officer Christie recalled that they were not at the house long before L.H., her mother, and her brothers were taken to the police station.

Detective Ken Potter of the MPD testified that he interviewed L.H. and her mother at the police station. Detective Potter spoke with L.H.'s mother alone and testified that she was "appropriately upset" and told him that she believed L.H. because she "had an attitude but she was honest." Detective Potter asked L.H.'s mother if the [petitioner] did or said anything unusual when they had sexual intercourse. L.H.'s mother told Detective Potter that the [petitioner] would rub his penis on her genitals and say, "Who's your daddy." Detective Potter then interviewed L.H. and asked her what the [petitioner] would say to her during sexual encounters. L.H. told Detective Potter that the [petitioner] would say, "Who's your daddy" and threaten to hurt her or take her away if she ever told anyone about what he had done.

Detective Potter testified that the purpose of his interview with the victim was to confirm the allegations and determine whether a forensic interview conducted by an expert in child sexual abuse was needed. Detective Potter told the jury that his interview with the victim was not intended to be thorough and that it was common for more details to come out in the forensic interview or at trial. During the interview, L.H. told Detective Potter that the [petitioner] had licked and felt her breasts and vagina and that he had felt her buttock. L.H. also told Detective Potter that the [petitioner] made her

---

[3] All minors involved in this case will be referred to by their initials in order to protect their privacy.

masturbate his penis, perform fellatio on him, and the [petitioner] would rub his penis on her vagina. When asked by Detective Potter how many times this had happened to her, L.H. responded that it had happened "5,000 times or more." L.H. testified that she meant it had happened so many times she could not remember an exact number, and Detective Potter testified that is what he understood her to mean. L.H. also told Detective Potter that she did not know how to describe the [petitioner]'s penis but that the [petitioner] did ejaculate.

After his interview with L.H., Detective Potter spoke with L.H.'s mother and she agreed to conduct a "controlled phone call or a pretext phone call" with the [petitioner]. L.H.'s mother called the [petitioner], while Detective Potter recorded the conversation. During the controlled call, L.H.'s mother confronted the [petitioner] with L.H.'s allegation. The [petitioner] "adamantly denied that the allegations were true." The [petitioner] stated that he was only alone with L.H. a few times and that he never had the opportunity to commit the alleged acts. However, L.H.'s mother testified that she worked full-time but that the [petitioner] did not always work and had opportunities to be alone with L.H. During the controlled call, L.H.'s mother also confronted the [petitioner] about showing pornography to L.H. The [petitioner] suggested that L.H. may have walked in while he was viewing pornography but that he did not show it to her. Toward the end of the conversation, the [petitioner] asked L.H.'s mother if he could go home or if he would be arrested when he got there.

Detective Potter admitted that no physical evidence was ever collected in this case. Detective Potter also admitted that no witness involved in the case had ever suspected the [petitioner] of raping L.H. prior to her allegations. On cross-examination, Detective Potter also acknowledged that during his interview with L.H., she did not tell him about several of the specific instances she testified about at trial. However, Detective Potter reiterated that the purpose of his interview was to simply verify the allegations, not to get specific details of each offense. Detective Potter also testified that since 2005 no one had ever came forward alleging that L.H. had lied about the allegations.

Frankie Cowan testified that she was the former clinical direct[or] of the Nashville Child Advocacy Center, where she served as a child therapist and supervised other therapists and forensic interviewers. In January 2005, a forensic interview of L.H. was conducted by Jennifer Hastings. Ms. Cowan supervised the interview. Ms. Cowan testified that a forensic interviewer is not trained to obtain every detail of the abuse but that they only determine if

harm was done to the child. During the interview, the forensic interviewer asks broad questions followed by more detailed questions. The forensic interviewer does not ask the victim "to tell me everything that has ever happened to you of a sexual nature," nor does the interviewer tell the child that it is important to tell everything that happened. Ms. Cowan testified that it is not unusual for a child to give more information or detail after the forensic interview.

During Ms. Cowan's testimony, the jury was shown a videotape of L.H.'s forensic interview. The interviewer asked L.H. what the [petitioner] did, and after a long pause, L.H. said that the [petitioner] would rub her vagina, buttock, and breasts and that the [petitioner] would lick her vagina. The interviewer then asked L.H. to tell her about the last time it happened. L.H. told the interviewer about the incident after her trip to Wal-Mart and said that the [petitioner] "whooped" her when she started screaming and then rubbed her vagina with his penis. The interviewer asked L.H. to tell her about the first time and L.H. described the incident when she was eating breakfast and the [petitioner] stuck his penis in her mouth. L.H. then told the interviewer that when she lived "in the white house," the [petitioner] made her watch a pornographic movie while her brother played a video game in the other room. L.H. told the interviewer that the [petitioner] showed her the movie in her room, on her television, while they sat in a pink chair and he touched her vagina under her clothes.

The interviewer asked L.H. if the [petitioner] ever made her touch any part of his body. L.H. responded that "sometimes" the [petitioner] told her to touch his penis and "sometimes" he told her to put his penis in her mouth. L.H. also told the interviewer that the [petitioner] showed her another pornographic film while they lived "at the white house" but that she could not remember if he touched her. The interviewer asked L.H. if she could remember any other times the [petitioner] touched her. L.H. told her that her mother had been out of town for a work trip and that while they were in his bedroom, the [petitioner] put his penis in her mouth, rubbed her breast and buttock with his hands, and rubbed his penis on her vagina until "white stuff came out." L.H. also said that sometimes the [petitioner] would say, "Who's your daddy" but that the [petitioner] never put his penis inside[] her vagina.

L.H. admitted during her testimony that she did not tell Officer Christie, Detective Potter, or the forensic interviewer about several of the incidents she had testified about at trial. These incidents included, the first incident she

remembered, the incident that occurred during the move from the duplex to Baton Rouge, that the [petitioner] had shown her pornographic magazines, that the [petitioner] had shown her pornography on the computer, the incident that occurred with her little brother in the room, and the incident with the handcuffs. L.H. also admitted that she had told the forensic interviewer that the breakfast incident was her first sexual contact with the [petitioner]. However, L.H. testified that even though she did not tell the police or the forensic interviewer everything, she had told them everything she could think of. L.H. also testified that she did not offer information if she was not specifically asked about it.

On cross-examination, L.H. admitted that a few weeks before she told her friends about the [petitioner]'s actions, she told her mother she wanted to live with her biological father and argued with her mother about it. L.H. testified on redirect-examination that she wanted to live with her father to get away from the [petitioner]. L.H.'s mother testified that L.H. asked to live with her biological father and said that she wanted her biological father and mother to get back together. Defense counsel questioned L.H. about how the [petitioner] would discipline her. L.H. responded by saying that the only discipline the [petitioner] would inflict on her was "sexual abuse." Despite defense counsel's questioning, L.H. denied that she had misbehaved at the Wal-Mart and that her mother had taken her back home for the [petitioner] to discipline her. L.H.'s mother also testified that L.H. had not been "acting up" at the Wal-mart and that she took her home because L.H. felt ill. L.H. admitted on cross[-]examination that she had sent the [petitioner] a Valentine's Day card after she had accused him of sexual abuse. L.H. also admitted that after the allegations were made, she hugged the [petitioner] and gave him a father's day gift. L.H. testified that even after all the [petitioner] had done to her, she still loved him like a father.

L.H.'s mother testified that L.H. continued to suffer after making these allegations against the [petitioner]. Specifically, L.H. was unable to see her step-brothers and this "devastated" her. Additionally, without the [petitioner]'s financial support, L.H.'s mother had to take a second job and was at home less. L.H. was in counseling, including counseling with Ms. Cowan, and had failed a grade in school. L.H.'s mother also testified that L.H. never recanted her story. However, L.H.'s mother admitted on cross-examination that neither she nor her other children ever saw the [petitioner] act inappropriately around L.H. L.H.'s mother testified that while the [petitioner] was in prison, she received a letter from him in which he told

her that things could go back to normal if she and L.H. did not testify. The [petitioner] offered to help L.H.'s mother in custody proceedings with L.H.'s biological father if she helped him in his criminal case.

L.H.'s mother admitted on cross-examination that after L.H. made the allegations against the [petitioner], she remained married to the [petitioner] for over a year and a half. Additionally, the [petitioner] financially supported the family for over two years after the allegations were made. L.H. and her family continued to have contact with the [petitioner] and traveled with him to weekend basketball tournaments and on family vacations. L.H.'s mother admitted that she only divorced the [petitioner] after the Department of Children's Services (DCS) took her children away for continuing to have contact with the [petitioner]. L.H.'s mother also admitted that a week after the allegations were made, she and the [petitioner] took a vacation together, but she testified she did it "to get [the petitioner] to admit to [her] what he had done." L.H.'s mother testified that she did not continue to see the [petitioner] because she did not believe her daughter but that she continued to contact him because she loved the [petitioner]. She said that she regrets her actions.

. . . .

Kenneth Koontz testified that his step-daughter was friends with L.H. in 2005. Mr. Koontz told the jury that a week or two after L.H. had been interviewed by the police, he picked L.H. up from the Netherlands Drive residence so she could spend the night with his step-daughter. On the drive back to his house, Mr. Koontz asked L.H. what she wanted to do when she grew up. Mr. Koontz testified that L.H. answered that she wanted to be a writer because she had "the ability to make things up and get people in trouble." L.H., during her testimony, denied ever saying this to Mr. Koontz. On cross-examination, Mr. Koontz admitted that he never contacted the police about L.H.'s alleged statement. Mr. Koontz admitted that he was a former police officer and understood the exculpatory nature of L.H.'s alleged statement. Mr. Koontz testified that he did not come forward until he was contacted by an attorney involved in the case but that he could not remember if the attorney was a member of the prosecution or the defense team. On cross-examination, Mr. Koontz also testified that he could not recall telling his ex-wife that the [petitioner] told him "the worst [the petitioner] ever did was show [L.H.] pornography."

The [petitioner] denied that he ever had any type of "inappropriate

relationship" with L.H. and that he ever had any sexual contact with L.H. The [petitioner] specifically denied all of L.H.'s allegations. The [petitioner] testified that he had "a really good relationship" with L.H. and her brothers, that he loved them, and that he was fully involved in their lives. However, the [petitioner] testified that when he first moved in with L.H.'s mother, there were "discipline problems" with the children "not minding [their mother]." According to the [petitioner], L.H. "had a little bit of a problem with backtalking" and "didn't receive [discipline] very well." The [petitioner] testified that L.H. would tell him "that [he] wasn't her father and that [he] couldn't tell her what to do."

The [petitioner] testified that everyone in the house slept with their door open and that he would not wear only a towel around the house. The [petitioner] also testified that he may have asked L.H.'s mother "Who's your daddy" while they were having sex but that "[i]t was kind of a joke thing." The [petitioner] also claimed that it "was a common phrase that everybody said" and that "[w]e all said it around the house as a joke all of the time." The [petitioner] denied ever showing L.H. pornographic material as well as telling Mr. Koontz that he had shown L.H. pornographic material. The [petitioner] claimed that L.H. and her brothers found the pornographic magazines in their uncle's bedroom. The [petitioner] admitted to viewing pornography on his computer but claimed that it was only after he moved out of the Netherlands Drive house. The [petitioner] also claimed that L.H.'s mother only confronted him about pornographic movies that had been rented from the cable company and, according to the [petitioner], it had been L.H.'s older brother who was renting those movies. The [petitioner] denied ever hiding a substance called "Rush" or "Haze" in a yellow sock in his bedroom. The [petitioner] also denied that he laughed during the controlled phone call with L.H.'s mother. Instead, the [petitioner] insisted that he was crying and it only sounded like he was laughing.

The [petitioner] admitted on direct examination that he had been employed as a parole officer and that he lost his job after taking "a check from a family inappropriately" and cashing the check. The [petitioner] also admitted on direct examination that when he was initially asked about the check he denied that he had taken the check. On cross-examination, the [petitioner] again admitted that he was fired from his job as a parole officer for taking a check from the family of a parolee. The [petitioner] also admitted that when he was shown the check with his endorsement that he denied taking and signing the check.

-10-

The [petitioner] testified that after L.H. made the allegations against him, he moved out of the house at Netherlands Drive. However, the [petitioner] testified that L.H.'s mother wanted to see him and talk to him. The [petitioner] and L.H.'s mother went on a vacation together a few weeks after L.H. had spoken to the police. The [petitioner] continued to coach L.H.'s brothers in basketball and continued to referee youth sporting events. The [petitioner] testified that after L.H. had gone to the police, he felt guarded around L.H. and no longer felt comfortable around L.H. The [petitioner] testified that he and L.H.'s mother spoke to each other every day for over a year after the allegations were made. The [petitioner] also continued to support L.H.'s family financially and had a joint bank account with L.H.'s mother. The [petitioner] testified that he helped L.H.'s mother retain an attorney for her children's custody proceedings. According to the [petitioner], it was only after DCS took L.H. and her brothers away from their mother that she cut off contact with him.

On cross-examination, the [petitioner] admitted that he wrote L.H.'s mother a letter while he was in prison. The [petitioner] denied that he intended to get L.H. and her mother not to testify or to lie about what happened. However, the letter proposed that the [petitioner] would testify on behalf of L.H.'s mother if she would help him at his criminal trial. The letter also requested L.H.'s mother to tell the police that she was mistaken about the information she had provided and that the whole situation was a mistake. In the letter, the [petitioner] begged L.H.'s mother "not to let them put [him] in prison for the rest of [his] life." The [petitioner], in the letter, also denied ever asking L.H.'s mother "Who's your daddy."

The [petitioner] testified that L.H. never saw him and her mother engaged in sexual activity. The [petitioner] told the jury he did not know where L.H. had learned "all of that specific sexual knowledge." Instead, the [petitioner] testified that it was just a coincidence L.H. knew about hair pulling and his habit of saying, "Who's your daddy" during sexual intercourse. The [petitioner] also claimed that L.H. was motivated to lie about him because she wanted "to be with her father and to live with her father which she told her mother that all of the time."

Jacob Smith, the [petitioner]'s son, testified that he lived with the [petitioner] and L.H.'s family for half of a school year and that he visited every other weekend. Mr. Smith testified that he never saw anything inappropriate between the [petitioner] and L.H. According to Mr. Smith, the [petitioner]

-11-

would discipline L.H., who did not like the [petitioner] because of his discipline. Mr. Smith testified that L.H. wanted to live with her biological father and that she "did not like [the petitioner] at all."

Danny Ray Smith, 2011 WL 1432033, at *3-11.

The petitioner filed a petition for post-conviction relief on August 20, 2012, raising several claims of ineffective assistance of counsel. Specifically, he alleged that his trial counsel provided ineffective assistance by, among other things: failing to object to the testimonies of Detective Potter and Frankie Cowan that it was common for child victims to give more details concerning the allegations as time goes on; failing to object to Cowan's testimony that the victim had been in counseling with her; failing to object to Detective Potter's testimony about how the victim described sexual contact with her genital area; failing to object to Detective Potter's testimony that he attempted to talk to the petitioner but was unable to do so; and failing to move for a mistrial when the State cross-examined the petitioner about the petitioner's not speaking to the detective. The petitioner also alleged that the cumulative effect of counsel's acts and omissions amounted to ineffective assistance of counsel.

The post-conviction court conducted an evidentiary hearing on January 25, 2013, at which the petitioner's trial counsel testified that, at the time of trial, he worked for the public defender's office and had practiced law for approximately seven years. Counsel agreed that the original bill of particulars only alleged three separate instances of misconduct but that, approximately a week before trial, he received an amended bill of particulars alleging that all of the counts against the petitioner were separate instances of misconduct. Counsel filed a motion to limit the State to the original bill of particulars, but the trial court denied the motion and offered to continue the case for counsel to conduct any extra investigation deemed necessary. Counsel decided not to continue the case because he thought that the victim's last-minute additional allegations would help his trial strategy of showing that the victim was not telling the truth.

Counsel recalled that Frankie Cowan of the Child Advocacy Center testified that the victim had been in counseling with her and also that it was typical for children to reveal more information about sexual abuse as time goes on. Counsel admitted that he did not object to Cowan's testimony and that he could think of no advantage to the defense by his not objecting.

Counsel recalled that Detective Potter also testified at trial and was asked whether it was typical for children to reveal more about sexual abuse over the course of time to which he responded that it was typical in his experience. Counsel admitted that he did not object

-12-

to Detective Potter's testimony and that he could think of no advantage to the defense by his not objecting. He elaborated that he did not "have a specific recollection as to why [he] did not object to it." Counsel also acknowledged that Detective Potter testified about a particular way the victim described an allegation of penetration and conceded that he did not object when Detective Potter was asked "as a seasoned sex abuse detective, what he took that to mean, and whether that was a common way that children would . . . describe penetration. And he acknowledged that that was typical for children to do[.]" Counsel admitted that he did not know of any advantage to the defense "to not objecting to that opinion or expert sounding testimony."

Counsel recalled that he objected to a particular line of questioning about whether the petitioner was cooperative or agreed to talk to the police. Counsel acknowledged that the court allowed the State "to ask, that if he attempted to contact him, and then just, if he ever officially interviewed him." Counsel admitted that he told the court he was fine with those two questions because he was concerned the State was "going to be allowed to ask broader questions than that, and [he] didn't want that to happen." However, the question that was actually asked of the detective was whether he was "ever able to speak or conduct an interview with [the petitioner]." Counsel conceded that he did not object to that question, explaining, "I imagine I was trying not to highlight the situation."

Counsel acknowledged that the State attempted to ask the petitioner on cross-examination whether he talked to police, and counsel objected. The court sustained the objection and admonished the State not to ask anything about the petitioner's failure to give an interview. However, the State asked, in the very next question, whether Detective Potter called him in connection with this investigation and whether the petitioner talked to the detective. Although counsel objected again, he did not move for mistrial and could not recall why he did not do so. He elaborated, "I don't know if I thought about it and decided not to or didn't think about it at all. I just don't remember."

On cross-examination, counsel affirmed that the defense case at trial rested on two premises: that the acts of sexual abuse did not happen and that the victim was lying. Counsel said that, when the court denied his motion to limit the State to the allegations in the original bill of particulars, he made the strategic decision to attempt to exploit the fact that the victim's allegations changed over time. Counsel agreed that it was a fair statement to say that the questions asked of Cowan to which he did not object were "one or two questions within a great deal of context related to the way and the disclosure in this case came out[.]" With regard to how the court told the State it could question concerning the petitioner's not talking to police and the actual question asked, counsel stated, "I don't know how they're appreciably different." He agreed that "in a fairly long contentious trial, it doesn't make sense to be jumping up and objecting to every little thing that doesn't have an appreciable

prejudice to your client[.]" With regard to his not requesting a mistrial after the State asked a question that had already been objected to, counsel acknowledged that the record reflected that his objection was sustained and the improper question was not answered.

On redirect examination, counsel admitted that he filed no pretrial motions regarding the "opinion testimony" of Cowan or Detective Potter.

On February 6, 2013, the post-conviction court entered an order denying the petition. The court found that the petitioner failed to prove his allegations by clear and convincing evidence or demonstrate any prejudice due to the alleged errors. This appeal followed.

## **ANALYSIS**

On appeal, the petitioner argues that he received ineffective assistance of counsel because counsel failed to object to Detective Potter and Frankie Cowan testifying that it was common for child victims to give more details concerning the allegations as time goes on; failed to object to Cowan testifying that the victim had been in counseling; failed to object to Detective Potter testifying about how the victim described sexual contact with her genital area; failed to object to Detective Potter testifying that he attempted to talk to the petitioner but was unable to do so; and failed to move for a mistrial when the State cross-examined the petitioner about the petitioner's not speaking to the detective. The petitioner also alleged that the cumulative effect of counsel's acts and omissions amounted to ineffective assistance of counsel.

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a post-convictions court's application of the law to the facts of the case is *de novo*, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed *de novo*, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S.

668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). Moreover, the reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

### I. Testimony that Child Victims Commonly Disclose More Over Time

The petitioner first asserts that counsel rendered ineffective assistance by failing to object to testimony concerning the timeliness of the victim's disclosures of misconduct. He points to Frankie Cowan's testimony that "it was not unusual for children to provide more disclosures or more information after the forensic interview is over," and to Detective Potter's testimony that disclosures often come out a little at a time. The petitioner argues that this testimony served to bolster the victim's credibility, which had been greatly called into question by the fact that she testified to numerous instances of sexual assault when she had

-15-

previously only alleged three instances. He also argues that neither witness was qualified as an expert, yet their testimony "had the impact of expert opinion testimony[.]" In support of his argument, the petitioner relies on State v. Emoe Zakiaya Mosi Bakari, No. M2010-01819-CCA-R3-CD, 2012 WL 538950 (Tenn. Crim. App. Feb. 15, 2012).

In Bakari, this court determined, on a direct appeal, that it was error to allow testimony concerning delayed disclosure where the person testifying essentially gave expert testimony, but was not qualified as an expert, and the testimony only served to bolster the victims' credibility. Id. at *9. The victims in that case testified about incidents of sexual abuse that had not been reported until at least four years after it occurred. Id. at *1-2. At trial, a licensed clinical social worker with seventeen years of experience interviewing children, testified:

> Roughly just recalling our data, anywhere from 75 to 80, 85 percent of our children that come to us come with an allegation that is not acute, which means that it is older than five days. It can be anywhere from several days to several weeks to several months to several years and that, that describes literally anywhere between 75 and 85 percent of our population.

Id. at *6. Her testimony continued, "It certainly does not mean that the allegation is true and I would not say that delayed disclosure, you know, equals truth. . . . It simply is the norm." Id.

The trial court allowed the social worker's testimony because that defendant was going to bring up that the victims did not disclose the misconduct for four years. Id. at *7. Even so, this court found that the trial court erred in allowing the social worker to testify about delayed disclosure without being qualified as an expert and where the only purpose for offering the testimony was to bolster the victims' credibility. Id. at *9. However, this court determined that the error was harmless. Id.

In light of this precedent, we note that, if we were currently addressing a direct appeal, Frankie Cowan's and Detective Potter's testimony would be deemed erroneous. However, in this post-conviction proceeding, we are analyzing whether there was a deficiency in counsel's performance and if any deficiency prejudiced the petitioner. We need not address whether counsel performed deficiently because we conclude that there is no reasonable probability that the result of the proceeding would have been different. The victim's testimony was detailed and consistent. It was corroborated to some extent by the victim's mother's testimony about a phrase used by the petitioner during sexual encounters, the victim's mother's recollection of the petitioner's behavior during a phone call when she was out of town, and the victim's mother's recollection of the victim's behavior after the victim's

mother returned from a trip to Walmart. In addition, Cowan's and Detective Potter's testimony about delayed disclosure was much more cursory and brief than the social worker's in Bakari. Accordingly, we conclude that the petitioner would have been convicted of the crimes with or without the statements of Cowan and Detective Potter.

## II. Testimony that the Victim had been in Counseling

The petitioner asserts that counsel rendered ineffective assistance by failing to object to Cowan's testimony that the victim had been in nine or ten counseling sessions with her over the course of several months. He summarily claims that such testimony was not relevant to any issue in trial and improperly bolstered the credibility of the victim's testimony. The petitioner has failed to prove that counsel performed deficiently in not objecting to the relevance of this testimony, as we discern the relevance being that it showed the basis of Cowan's familiarity and interaction with the victim. Even though we need not address the prejudice prong given that the petitioner failed to prove that counsel performed deficiently, we determine that the State's reference to counseling in rebuttal argument was a reasonable rehabilitation to the credibility of the victim's allegations in response to counsel's aggressive attack of such.

## III. Testimony about the Victim's Description of Sexual Contact

The petitioner asserts that counsel rendered ineffective assistance by failing to object to Detective Potter's testimony "about the unusual way in which [the victim] described one of the allegations of rape and was asked by the State whether that was 'a common way that children describe sexual contact with their genital area[.]"

At trial, Detective Potter testified about how the victim, four years earlier at the age of twelve, described one of the instances of sexual assault she experienced. He testified:

A. I asked her if he touched her with anything more than his mouth or his hands and she said that his weiner. She described that he would . . . rub his weiner on her vagina.

Q. And are those words that she used at that time at 12-years-old rubbed his weiner on her vagina?

A. Rubbed his weiner on my vagina.

Q. Okay.

A. And she went on to say that he put it inside but not on the inside, when I asked her to explain that again she said I don't know how.

Q. Okay. So when she said to you a seasoned sex abuse detective he would put it inside but not on the inside what did you take that to mean?

A. Inside the labia.

Q. Is that a common way that children describe sexual contact with their genital area?

A. I have victims describe the exact same thing, same words.

The petitioner seemingly asserts that the detective's response, "I have victims describe the exact same thing, same words," constitutes improper expert testimony. However, we cannot conclude that counsel performed deficiently in failing to challenge Detective Potter's testimony in this regard because anyone could recognize the difficulty a child could have with the terminology needed to describe a sexual act or anatomical feature with which a child would not be familiar. In any event, we do not discern any prejudice because Detective Potter, if challenged, would have certainly qualified as having "knowledge, skill, experience, training, or education" in dealing with children reporting sexual abuse. See Tenn. R. Evid. 702.

## IV. Testimony About the Petitioner's Not Being Interviewed

The petitioner argues that counsel rendered ineffective assistance by failing to continue in an objection to the State's questioning of Detective Potter about his efforts to speak with the petitioner during his investigation.

At trial, Detective Potter testified that, after he talked with the victim, he spoke with the victim's mother and attempted a controlled phone call to the petitioner. During the call, the victim's mother confronted the petitioner about the victim's allegations of sexual abuse, and the petitioner "adamantly denied that the allegations were true." Moments later, the State asked Detective Potter, "[A]s part of your investigation did you attempt to discuss these allegations with [the petitioner] himself?" Counsel objected and explained to the court: "I don't think that it is relevant; and number two, he has an absolute right not to talk to the police and I don't think that he should be asked questions to make it look like he has done something nefarious by not talking to them."

The State argued that "it would leave [the jury] with the conceptional gap if we were

-18-

to leave them with the idea that this Detective didn't even try to talk to him and give him a chance to tell his side." The court suggested that the State ask, "[W]hy don't you say did you make multiple attempts to contact him? Did you ever get to interview him? No." Counsel expressed his concern, "I am afraid that [the prosecutor] is going to make the impression that by him not wanting to talk to the police that there is something that he has done inappropriate there." The trial court offered another alternative: "If you want to say did you attempt to contact him and did you ever officially interview him, no, and leave it at that." Counsel stated, "I am fine with that."

The State then asked the following questions:

Q. Detective Potter, as a sex abuse detective is it part of your investigation to attempt to speak with the alleged perpetrator in the cases that you are investigating?

A. Yes, ma'am, it is.

Q. And is that something that you do in ever[y] case, attempt to do in every case?

A. Yes, ma'am.

Q. And did you do that in this case?

A. I did.

Q. And did you ever, were you ever able to speak with or conduct an interview with [the petitioner]?

A. I was not able to conduct an interview. No, ma'am.

Citing Emoe Zakiaya Mosi Bakari, 2012 WL 538950, at *9-10, to support his position, the petitioner complains that counsel should have continued in his objection because the detective's testimony "amounted to an improper comment on his right to remain silent as well as being prejudicial and not probative of any fact at issue[.]" (Pet. Brief pg. 19) However, in Bakari, the investigating detective was allowed to testify in significant detail about his failed efforts to speak with the defendant during the investigation:

At trial, Detective Adkins testified that he met with the appellant on Friday, October 5, 2007. He said the interview lasted about an hour and that

it ended because the appellant "stated that he needed to get to work." They scheduled an interview for the following Monday, but the appellant telephoned the detective and canceled the interview because he had to work. The appellant was supposed to call Detective Adkins to schedule a second interview but never did. Detective Adkins said,

> [F]or the next couple of months I made several attempts to contact Mr. Bakari to try and get a second interview and was unable to until I believe December 6, 2007[.] I finally was able to get him on the phone and he agreed to come in for an interview a couple of days later, I believe on December 10, 2007.

The appellant voluntarily came to the police department for the second interview as scheduled. However, the appellant terminated the interview after only nineteen minutes.

Id. at *10.

As shown, Bakari presents a factual scenario quite different from that presented in this case, and Bakari was a direct appeal review not a post-conviction review of counsel's performance. In Bakari, the detective testified to a pattern of avoidance by that defendant, but no such suggestion was made by the testimony of Detective Potter in this case. The State asked Detective Potter whether he attempted and was able to speak to the petitioner, to which the answer was, "I was not able to conduct an interview." There was no suggestion that the petitioner repeatedly attempted to avoid investigators or that he was uncooperative in the investigation. Counsel successfully limited the scope of the State's question, and there is no indication that any further attempts to limit the questioning would have been successful. Moreover, we do not see how the minor testimony that the detective was not able to interview the petitioner prejudiced the defense.

## V. Mistrial

The petitioner argues that trial counsel rendered ineffective assistance when he failed to request a mistrial after the petitioner was asked by the State on cross-examination about his "refusal to meet with the police." He asserts that the questions regarding his failure to meet with Detective Potter "improperly diminished his credibility." (Pet. Brief pg. 22)

During cross-examination of the petitioner at trial, the State questioned the petitioner as follows:

Q. Your lawyers made some issue about two sides to the story. You agree that there are always two sides to a story, right?

A. Yes, sir.

Q. You had the opportunity to share your side of the story with the police. They contacted you in --

[DEFENSE COUNSEL]: Judge, I am going to object --

Q. [By the State] -- connection with the investigation?

[DEFENSE COUNSEL]: -- to where this is about to go.

THE COURT: All right. I will sustain the objection.

[THE STATE]: May we be heard on that? Can we approach?

THE COURT: All right. You can step up.

. . . .

[THE STATE]: I am [sic] not entitled to ask him whether he was afforded the opportunity to speak with the police at the time of the investigation and he did not do that?

THE COURT: Well, doesn't he have a right not to?

[THE STATE]: Yes, he does.

THE COURT: Wouldn't that be asserting his 5th Amendment right to not do that?

[THE STATE]: And he can do -- no, pre-arrest, premiranda silence can be used to impeach the Defendant.

THE COURT: You are wanting to ask him was he given an opportunity to speak with law enforcement –

[THE STATE]: And refused to --

THE COURT: -- and did he choose not to?

[THE STATE]: Correct. Do you think --

[DEFENSE COUNSEL]: You ruled on this yesterday. I mean, he has got the constitutional right to say that he doesn't want to talk to the police. They should --

THE COURT: Well, it was a different issue --

[DEFENSE COUNSEL]: -- not have the opportunity –

THE COURT: -- as to where they were wanting to go with that.

[DEFENSE COUNSEL]: -- they should not have the opportunity to say you had the opportunity to talk to the police and you chose not to to make it look as if he has done something wrong which is what they intend to do.

THE COURT: And -- and the relevance of that would be?

[THE STATE]: The relevance is is that he learns of the investigation and he knows that the detective wants to speak with him and he refuses to talk to him, that is relevant and --

THE COURT: And that proves what that he is guilty?

[THE STATE]: I think it tends to show exactly that.

THE COURT: Okay. All right. I will sustain the objection.

[DEFENSE COUNSEL]: Thank you.

Immediately thereafter, the State asked the petitioner the following:

Q. Did Detective Potter call you in connection with this investigation?

A. Yes, sir.

-22-

Q. Did you talk to Detective Potter?

[DEFENSE COUNSEL]: Judge, is this not the same thing we just dealt with?

THE COURT: Okay. I will sustain the objection. (TT IV: 418-421)

The decision of whether or not to declare a mistrial lies within the sound discretion of the trial court. State v. Land, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000). A mistrial should be declared in a criminal case only when something has occurred that would prevent an impartial verdict, thereby resulting in a miscarriage of justice if a mistrial is not declared. See id.; State v. Jones, 15 S.W.3d 880, 893 (Tenn. Crim. App. 1999); Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). "Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991) (quoting Arnold, 563 S.W.2d at 794). A manifest necessity exists when there is "no feasible alternative to halting the proceedings." State v. Knight, 616 S.W.2d 593, 596 (Tenn. 1981). The burden to show the necessity for a mistrial falls upon the party seeking the mistrial. Land, 34 S.W.3d at 527. This court will not disturb the trial court's decision unless there is an abuse of discretion. Id.

The petitioner has failed to prove a manifest necessity for a mistrial such that we could determine counsel performed deficiently for failing to request one or that the petitioner was prejudiced. The record shows that the State, contrary to the court's ruling, asked the petitioner if the detective called him in connection with the investigation to which the petitioner responded that he had. However, when the State asked if he talked to the detective, counsel immediately objected and the objection was sustained. Given counsel's prompt action and the fact that the only thing divulged by the State's improper question was that Detective Potter called the petitioner, a suspect in a criminal investigation, leads us to the conclusion that there was no miscarriage of justice without a mistrial.

## VI. Cumulative Error

The petitioner argues that he was denied the effective assistance of counsel due to the cumulative effect of counsel's errors. The petitioner is merely resubmitting the issues he has already presented, and we respectfully disagree with his assertion that he is entitled to a new trial based on cumulative error.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the denial of the petition.

_____
ALAN E. GLENN, JUDGE